**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 93-8603

_____


ARTELIA M. SCOTT,

Plaintiff-Appellant,

VERSUS

GEORGE E. MOORE,
Individually and as an Employee of
the City of Killeen Police Department;

F.L. GIACOMOZZI,
in his Official Capacity as
Chief of Police,

and

CITY OF KILLEEN, TEXAS,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Western District of Texas
_____
May 20, 1997


Before POLITZ, Chief Judge, WISDOM, KING, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE,
EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS,
Circuit Judges.


JERRY E. SMITH, Circuit Judge:


While a pretrial detainee at the Killeen city jail, Artelia

Scott was sexually assaulted by a jailer, defendant George Moore.

She brings a constitutional claim under 42 U.S.C. § 1983, asserting

that the attacks resulted from improper staffing procedures at the jail. In particular, she argues that constitutionally adequate staffing would include having, at a minimum, a female jail official, or at least two male jail officials, on duty whenever a female pretrial detainee is in custody.

We affirm the summary judgment in favor of the city, concluding that the Constitution does not require the level of staffing Scott demands. In so doing, we employ a straightforward application of *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) (en banc), in which we explained the constitutional standards, under the Due Process Clause, applicable to pretrial detainees in local jails.

## I.

Scott was arrested on December 31, 1988, for public intoxication, assault, and resisting arrest. She was taken to the jail, processed by the female jailer on duty at the time, and placed in a holding cell pending arraignment. Moore subsequently replaced the female jailer, entered Scott's cell, and sexually assaulted her repeatedly during the course of his eight-hour shift. After being placed on administrative leave pending a police investigation, Moore resigned and pleaded guilty to criminal charges in connection with the assault.

## II.

Scott filed suit in state court against Moore and the city,

2

asserting various constitutional claims. Moore then declared bankruptcy and was dismissed from the suit, whereupon the city removed the case to federal court. The district court granted summary judgment for defendants, and a panel of this court affirmed on all issues except for Scott's inadequate staffing claim under § 1983. *See Scott v. Moore* ("*Scott I*"), 987 F.2d 771, No. 92-8284 (5th Cir. Mar. 3, 1993) (per curiam) (unpublished).

After remand, the district court granted summary judgment for defendants on the inadequate staffing claim. A second panel of this court vacated and remanded, whereupon we resolved to hear the matter en banc to consider the proper application of *Hare* to the instant facts. *See Scott v. Moore*, 85 F.3d 230 (5th Cir.), *vacated for reh'g en banc*, 85 F.3d 240 (5th Cir. 1996).

### III.

#### A.

In *Hare*, we reconciled our circuit caselaw regarding pretrial detainees, informed in particular by *Farmer v. Brennan*, 511 U.S. 825 (1994).[1] We noted that determining which standard to apply in analyzing constitutional challenges by pretrial detainees hinges upon the classification of a challenge as an attack on a "condition of confinement" or as an "episodic act or omission." 74 F.3d at 644. A "condition of confinement" case is a "[c]onstitutional attack[] on general conditions, practices, rules, or restrictions

---

[1] *Hare* has been described as "a single opinion that clearly and concisely articulates and unifies our court's case law in this area." *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 n.25 (5th Cir. 1996).

3

of pretrial confinement." *Id.*

Hence, where a detainee complains of the number of bunks in a cell or his television or mail privileges,[2] the wrong of which the detainee complains is a general condition of confinement. In such cases, the reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520 (1979), is apposite, as we may safely assume, by the municipality's very promulgation and maintenance of the complained-of condition, that it intended to cause the alleged constitutional deprivation. *See Hare*, 74 F.3d at 645 ("Only with such intentionality as a given is the [*Wolfish*] test useful."). Under *Wolfish*, 441 U.S. at 539, a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *See Hare*, 74 F.3d at 640.

In contrast, where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an "episodic act or omission" case and is not amenable to review under the *Wolfish* test. *See Hare*, 74 F.3d at 645. In an "episodic act or omission" case, an actor usually is interposed between the detainee and the municipality, such that the detainee

---

[2] The following were deemed to be conditions-of-confinement cases: *Murphy v. Walker*, 51 F.3d 714 (7th Cir. 1995) (revocation of telephone, television, and cigarette privileges); *Collazo-Leon v. United States Bureau of Prisons*, 51 F.3d 315 (1st Cir. 1995) (disciplinary segregation and denial of telephone and visitation privileges); *United States v. Millan*, 4 F.3d 1038 (2d Cir. 1993) (length of pre-trial detention); *Hause v. Vaught*, 993 F.2d 1079 (4th Cir. 1993) (restriction on mail privileges); *Brogsdale v. Barry*, 926 F.2d 1184 (D.C. Cir. 1991) (overcrowding); *Lyons v. Powell*, 838 F.2d 28 (1st Cir. 1988) (22-23-hour confinement and placement of mattress on floor); *Fredericks v. Huggins*, 711 F.2d 31 (4th Cir. 1983) (policy of refusing detainees access to drugs for rehabilitation); *Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981) (overcrowding).

complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

Although, in her amended state petition, Scott complains generally of inadequate staffing, i.e., "by having only one individual on duty, and/or by not having a female member present when female prisoners are confined," the actual *harm* of which she complains is the sexual assaults committed by Moore during the one eight-hour shiftSSan episodic event perpetrated by an actor interposed between Scott and the city, but allegedly caused or permitted by the aforesaid general conditions.

In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions. Here, however, Scott did not suffer from the mere existence of the alleged inadequate staffing, but only from Moore's specific sexual assaults committed on but one occasion.

Consequently, this case does not fit well within the conditions-of-confinement category and, in fact, bears a closer resemblance to cases regarding episodic acts by prison employees. Importantly, however, in *Hare* we carefully noted that the reasonable-relationship test employed in conditions cases is "functionally equivalent to" the deliberate indifference standard employed in episodic cases. *See Hare*, 74 F.3d at 643; *id.* at 646.

As in most cases involving incidents at jails, the defendants

5

here are both individual (Moore) and governmental (the city and the police chief in his official capacity). While the specific episode may be perpetrated by one or more persons, any underlying conditions that may have caused it or made it possible are the product of the city's policy, action, or inaction.

Hence, *Hare* requires that we separate the inquiry pertinent to the episodic act or omission ("the existence of a constitutional violation simpliciter") from that pertinent to the custom, rule, or policy that is alleged to have permitted the act ("a municipality's liability for that violation"). 74 F.3d at 649 n.4. Specifically, in *Hare* we described the proper methodology as follows:

> We separate the two issues: the existence of a constitutional violation simpliciter and a municipality's liability for that violation. Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with *subjective* deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. See *Farmer* [*v. Brennan*, 511 U.S. 825, 841 (1994)] ("It would be hard to describe the *Canton* [*v. Harris*, 489 U.S. 378 (1989)] understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

*Id.*

So, as to the discrete, episodic act, the detainee must establish only that the constitutional violation complained of was done with *subjective* deliberate indifference to that detainee's

6

constitutional rights. *Id.* In the instant case, Scott has met that burden.

Accordingly, we next must determine whether the city may be held accountable for that violation. Under *Hare*, as we have stated, this latter burden may be met by putting forth facts sufficient to demonstrate that the predicate episodic act or omission resulted from a municipal custom, rule, or policy adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. *See Grabowski v. Jackson County Pub. Defenders Office*, 79 F.3d 478, 479 (5th Cir. 1996) (per curiam) (en banc) (citing *Hare*, 74 F.3d at 649 n.4).

B.

There is no genuine issue of material fact concerning whether the city's failure to adopt a policy of additional staffing amounts to objective deliberate indifference. First, there is no showing that the city had actual knowledge that its staffing policy created a substantial risk of harm to female detainees. To the contrary, the city had followed the same staffing procedures since the late 1970's without any incident and had received no complaint of sexual assault by a jailer prior to this incident. As a condition of employment, Moore and the other three jailers underwent a background investigation, medical examination, and polygraph test, none of which revealed any issues of concern. Moore also had been employed previously as a commissioned police officer, without incident, for four years prior to his employment

7

with the jail and had been trained by experienced jailers in the official policies of jail management.

Scott offers the following evidence to suggest that the city should have known about the risks inherent in the staffing policy and in employing Moore: (1) the affidavit of Charles Craig, an expert in jail policy, who noted that a prison should have female officers to prevent assaults and that male officers should be supervised when allowed access to female inmates; (2) the affidavit of Melvin Williams, a local transvestite, who stated that he had performed oral sex on Moore during several different occasions when he had been under Moore's guard; and (3) Moore's statement to the police team investigating the rape, to the effect that he had had oral sex with more than a dozen other inmates on separate occasions. None of this evidence, however, establishes that the city knew or should have known of the risk attendant to its staffing policy.[3]

The city not only had instituted hiring procedures, including background checks, medical examinations, and polygraph tests, to minimize the risks of employing renegade jailers, but also had promulgated a general order to regulate the management of the jail and had trained its jailers in its provisions. Among other things, that order (1) prohibits male officers from frisking or conducting

_____

[3] The first panel to review this case stated, "There is no record evidence, however, that [police chief] Giacomozzi or any other policymaking official of the City was aware of any sexual assaults committed either by Moore or by other jail employees . . . . Scott has failed to show that Giacomozzi or any other city officials knew of or tolerated any sexual assaults in the city jail." *Scott I*, at 5, 7.

8

pat-down searches of female detainees; (2) requires that female detainees be searched by female personnel only; and (3) generally limits conduct between male and female jailers and detainees.

In addition, the jail is located on the first floor of the police department, in the patrol division area, and a patrol duty sergeant periodically checks on jail personnel. In fact, more than one hundred uniformed officers have unlimited access to the jail, making the clandestine commission of sexual offenses extremely difficult.

These actions, viewed individually and taken in whole, reflect substantial attention to the safety of female detainees. "This effort indicates not apathy, but concern." *Rhyne v. Henderson County*, 973 F.2d 386, 393 (5th Cir. 1992). At best, the evidence proffered by Scott may be construed to suggest that the jail could have been managed better, or that the city lacked sufficient prescience to anticipate that a well-trained jailer would, without warning, assault a female detainee. In either event, they do not reflect objective deliberate indifference to Scott's constitutional rights.[4]

The summary judgment, accordingly, is AFFIRMED.

<span style="color:red">ENDRECORD</span>

---

[4] Most recently, the Supreme Court has reminded us that for purposes of liability under § 1983, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 117 S. Ct. 1382, 1391 (1997).

WISDOM, Circuit Judge, with whom POLITZ, Chief Judge, and WIENER and DENNIS, Circuit Judges, join, dissenting:

In what amounts to social engineering by judicial fiat, the panel majority has decided that as a matter of constitutional imperative, the city must maintain a minimum of two male guards, or at least one female guard whenever a female detainee is present.[5]

New times demand new measures and new men;
The world advances, and in time outgrows
the laws which in our fathers day were best;
And, doubtless, after us, some purer scheme
Will be shaped by wiser men than we,
Made wiser by the steady growth of truth.[6]

Today, a majority of this court sitting en banc concluded that the sexual assault of a pretrial detainee at the hands of an unsupervised male guard does not justify even the development of a record in the district court. I cannot concur in such a

---

[5] *Scott v. Moore*, 85 F.3d 230, 236 (5th Cir. 1996)(Smith, J., dissenting).

[6] James Russell Lowell, "A Glance Behind the Curtain," 1843 in *Complete Poetical Works of James Russell Lowell* 49, 51 (Horace E. Scudder ed. 1925).

result.  As I see it, the majority misconstrues the plaintiff's complaint and applies the wrong legal standard.  Moreover, under any appropriate legal standard, the plaintiff has raised fact issues that warrant trial.

As stated in the panel opinion in this case, the constitutional right at issue is Scott's fourteenth amendment right to minimal levels of safety and security.[7]  Scott complains that the policy of having only one guard on duty in the jail did not meet those minimal requirements.  The question we remanded to the district court, then, concerned whether the city's policy rose to the level of a constitutional violation.  We did not decide the issue, and thus engaged in no "social engineering".  Rather, we concluded that this case had identified a developing issue; the same issue that is illustrated by the explosion of sexual harassment cases in this country,[8] and by the problems encountered in the military of late.[9]  The issue concerns the realities of human nature in situations where one individual occupies a position of substantial authority relative to another.  The situations or, more accurately, relationships are myriad:

[7]     *Scott*, 85 F.3d at 235.
[8]     From 1990 to 1996, the number of sexual harassment claims filed with the Equal Employment Opportunity Commission rose 250 percent.  Statistic supplied by the Equal Opportunity Commission, Office of Public Affairs.
[9]     A 1990 study by the Defense Manpower Data Center, 64 percent of the females studied had been victims of sexual harassment in the previous year.  DEFENSE MANPOWER DATA CENTER, SEXUAL HARASSMENT IN THE MILITARY: 1988 11 (1990).  *See also* John Lancaster, *Tailhook Probe Implicates 140 Officers; Pentagon Report Calls 90 Assaults at Navy Convention 'Failure of Leadership',* WASH. POST, Apr. 24, 1993, at A1.

supervisor to employee, military officer to soldier, guard to pretrial detainee.  Whatever the relationship, it is abundantly clear that our society is beginning to recognize these as potentially volatile situations.

The volatile situation in the present case becomes deeply suspect when viewed in the light of the proper legal standards. In *Hare v. City of Corinth*, we stated that, in cases involving general conditions of confinement, the proper standard by which to evaluate a city's policy is whether the policy is reasonably related to a legitimate government purpose.[10]  Where the conduct in question is episodic, analysis under the deliberate indifference standard is appropriate.  The settled, long established system for staffing a jail is clearly a condition of confinement and not an episodic act.

Something that is episodic is, by definition, incidental or occasional.  The conduct in question here was the antithesis of episodic; it was regular and systematic.  The staffing practice complained of had been in place for twenty years. In justifying its application of the deliberate indifference standard, the majority insists that the conduct complained of in this case was, in fact, episodic: "Although the plaintiff complains generally of inadequate staffing . . . the actual *harm* of which she complains is the sexual assaults committed by Moore."  This statement, unsupported by the record, focuses on the wrong conduct, the wrong actor, and changes the nature of the plaintiff's complaint

---

[10]     *Hare*, 74 F.3d at 643.

12

entirely. In distinguishing this case from others involving conditions of confinement, the majority suggests that in jail conditions cases, "the conditions themselves constitute the harm." In this case, this distinction is meaningless. The majority states that the conditions themselves constitute the harm where, for example, inadequate food or sanitary conditions are involved. In each of these cases, however, a policy results in a harm: inadequate food results in malnourishment; unsanitary conditions result in disease. The instant case is no different. The policy of inadequate staffing enabled the harm to be committed and actually facilitated the harm -- sexual assault.[11] Once the focus is shifted to the conduct actually complained of, the long established custom of inadequate staffing, it is apparent that such conduct was far from episodic.[12] The mischaracterization of this case as one involving an episodic act allows the majority to assess it under the deliberate indifference standard.[13]

_____

[11] Indeed, in comparing medical care with other conditions of confinement, the Supreme Court stated that "the medical care a prisoner receives is just as much a condition of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, *and the protection he is afforded against other inmates*. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (emphasis added). If protection from other inmates is a condition of confinement, then protection from a guard is a condition of confinement.

[12] To illustrate, the conduct in this case could be construed as episodic if, for example, the jail had normally had some system of supervision in place and only on this particular occasion was a lone male guard left to supervise a female detainee for an extended period. As stated above, this was not the case.

[13] I recognize our statement in *Hare* that the objective deliberate indifference test is functionally equivalent to the

(continued...)

Noting that the city offered only financial justifications for its staffing policy, the panel majority concluded that Scott had raised a fact issue sufficient to preclude summary judgment. We therefore remanded the case for the development of a record. We laid down no rule regarding a required number or gender of guards. We simply recognized the possibility that the Constitution requires more than was provided in this case. As the majority states, "the evidence proffered by Scott may be construed to suggest that . . . the city lacked sufficient prescience to anticipate that a well-trained jailer would, without warning, assault a female detainee." Stated another way, the issue we identified becomes clear: *perhaps* the city should be required to do more than leave a female pretrial detainee at the absolute, unfettered, and unsupervised authority of a male guard, regardless of how well trained he might be.

The majority opinion is, regrettably, a subterfuge to avoid opening the floodgates of litigation. I recognize that courts are to avoid becoming enmeshed in the minutia of prison conditions.[14] I am unwilling, however, to classify the issues in this case as "minutia".

Because I believe that Scott's claim properly raised a constitutional issue and an associated fact question, I would remand the case to the district court. Accordingly, I

(...continued)
reasonable relationship test employed in cases involving conditions of confinement. *Hare*, 74 F.3d at 643. I believe that under either standard, however, Scott has raised a fact issue.

[14] *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

14

respectfully dissent.