# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 14-10126

———

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2015

Lyle W. Cayce
Clerk

ESTATE OF WILBERT LEE HENSON, deceased; BARBARA KAY HENSON REED, Individually and on behalf of Estate of Wilbert Lee Henson; IWILLER G HENSON HENDRIX; WILMA LYNN HENSON; SHELISHA RICHARDSON,

        Plaintiffs - Appellants

v.

WICHITA COUNTY, TEXAS; DOCTOR DANIEL BOLIN,

        Defendants - Appellees

———

Appeal from the United States District Court
for the Northern District of Texas

———

Before BARKSDALE, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This 42 U.S.C. § 1983 case arises out of the death of Wilbert Lee Henson while in pretrial detention in a jail in Wichita County, Texas. This is the third appeal in this case. In the prior appeals, this court held that Defendants Nurse Kaye Krajca and Sheriff Thomas J. Callahan were entitled to qualified immunity. *See Estate of Henson v. Krajca*, 440 F. App'x 341 (5th Cir. 2011); *Estate of Henson v. Callahan*, 440 F. App'x 352 (5th Cir. 2011). Subsequently, relying heavily on this court's decisions, the district court granted summary

No. 14-10126

judgment in favor of the remaining two Defendants, Wichita County and Dr. Daniel Bolin. Plaintiffs timely appealed that decision, which we now AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 23, 2004, Henson was arrested for an outstanding warrant of bond forfeiture for driving with a suspended license and was taken to the Wichita County jail. Upon arrival, he informed the detention officer that he had pneumonia and emphysema and had been in the ER a few days earlier. The detention officer called the nurse on duty, Nurse George, and informed her that Henson was having trouble breathing.[1] When Nurse George saw Henson, he was "yelling and screaming" that he was short of breath. Nurse George gave Henson an albuterol inhaler and Keflex (an antibiotic), filled out an "Inmate Request for Medical Attention" (a "pink card"), and put him on the list to see Dr. Bolin, the physician in charge of the jail, the next morning. Overnight, however, Henson was transferred from the downtown facility to the jail annex, so he was not seen by Dr. Bolin during sick call on November 24. While Dr. Bolin usually held sick call at the annex the next day, he did not hold one on November 25 because it was Thanksgiving.

While at the annex, Henson's health declined. Henson, joined by other inmates in his cell block who recognized that he was sick, asked the officers to provide him medical care. On November 26, after Henson informed one of the detention officers that he had been using his inhaler every 10 minutes with no relief, the officer contacted Nurse Krajca. Nurse Krajca saw Henson and filled out a pink card, which noted that Henson was complaining of COPD (chronic obstructive pulmonary disorder) and pneumonia. Nurse Krajca gave him

---

[1] All of the nurses that interacted with Henson were "licensed vocational nurses" ("LVNs"). The Texas Nurse Practice Act states that "[t]he licensed vocational nurse practice is a directed scope of nursing practice under the supervision of a registered nurse, advanced practice registered nurse, physician's assistant, physician, podiatrist, or dentist." 22 Tex. Admin. Code § 217.11(2).

2

No. 14-10126

albuterol, put him on the list to see Dr. Bolin at the next sick call, and left instructions to the officers that Henson "may have one [breathing] treatment every 4 hrs if needed."

The last medical professional to see Henson was Nurse Coleman, who visited the general population tank on November 27 and spoke with Henson through the bars. Nurse Coleman gave him a seven-day supply of an antibiotic, an albuterol inhaler, and cough drops. Later that night, shortly after being taken for a breathing treatment, Henson pressed the intercom button to alert the control room that he was still having problems breathing. The shift supervisor called Nurse George, who instructed him to put Henson in solitary confinement, or "medical solitary," and check on him every fifteen minutes. The shift supervisor called Nurse Krajca for a second opinion, who told him to put Henson in medical solitary, take his vital signs, and check on him every thirty minutes. One of the detention officers took Henson's vital signs and reported them to Nurse Krajca: Blood Pressure 208/107, Pulse 92.

Early in the morning of November 29, so a day later, Henson pushed an emergency button located in his cell. The detention officers found him in his cell gasping for air, saying "I'm not going to make it." The officers put him in a wheelchair and took him to the multipurpose room, where they tried to give him a breathing treatment and calm him down. After a few minutes of struggling, Henson's eyes rolled back in his head and he passed out. The officers tried to perform CPR on Henson and called an ambulance. Henson was taken to the hospital where he was pronounced dead at approximately 6:17 a.m. on November 29.

Henson's four daughters filed the present lawsuit against numerous Defendants, including Wichita County, Sheriff Callahan, Dr. Bolin, and Nurse

No. 14-10126

Krajca.[2]  Relevant to this appeal, Plaintiffs contend that they are entitled to damages pursuant to § 1983 because Defendants, acting under the color of state law, violated Henson's Fourteenth Amendment rights by denying him medical care.  Each of these Defendants filed a motion for summary judgment. The district court denied summary judgment to the County and denied summary judgment to the individual Defendants, concluding that they were not entitled to qualified immunity.   Nurse Krajca and Sheriff Callahan appealed, and this court reversed.[3]  *See Krajca*, 440 F. App'x at 347; *Callahan*, 440 F. App'x at 358.  This court concluded that Nurse Krajca was entitled to qualified immunity because there was no evidence that she was deliberately indifferent to Henson's medical condition and medical needs.  *Krajca*, 440 F. App'x at 346.  Relatedly, the court held that because there was "no predicate constitutional violation upon which to base Sherriff Callahan's supervisory liability," he was also entitled to qualified immunity.  *Callahan*, 440 F. App'x at 358.

Although this court did not explicitly address Dr. Bolin's or Wichita County's potential liability, both Defendants asked the district court to reconsider its previous orders denying their motions for summary judgment, in light of this court's decisions.  The parties consented to proceed before a magistrate judge who, relying heavily on *Krajca* and *Callahan*, granted the motions to reconsider and granted summary judgment, dismissing the Plaintiffs' remaining claims.  Plaintiffs timely appealed.

---

[2] Plaintiffs named other Defendants, including detention officers and nurses, but none remain before this court.

[3] Dr. Bolin also appealed the district court's denial of summary judgment, but his appeal was dismissed for failure to prosecute.

4

No. 14-10126

## DISCUSSION

### I.    Standard of Review & Applicable Law

This court reviews "a district court's summary judgment ruling *de novo*, applying the same standard as the district court." *Stanley v. Trinchard*, 500 F.3d 411, 418 (5th Cir. 2007). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must view the evidence in the light most favorable to the party resisting the motion," here, the Plaintiffs. *Trevino v. Celanese Corp.*, 701 F.2d 397, 407 (5th Cir. 1983).

Dr. Bolin asserts, and the district court agreed, that he is entitled to qualified immunity, which alters the usual summary judgment burden of proof with respect to Plaintiffs' claims against him. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense [of qualified immunity], the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Confronted with a claim of qualified immunity, this court must determine whether the Plaintiffs allege the deprivation of a constitutional right and whether that right was clearly established at the time of the violation. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). "The Court may conduct the two-pronged inquiry in any order." *Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 422 (5th Cir. 2013).

The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc); *see also Krajca*, 440 F. App'x at 343 ("The Fourteenth Amendment requires that state officials not disregard the 'basic human needs' of pretrial detainees, including medical care."). This is because,

5

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Though the state has a recognized interest in detaining defendants for trial, the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In this circuit, the legal standard used to measure the due process rights of pretrial detainees depends on whether the detainee challenges the constitutionality of a condition of his confinement or whether he challenges an episodic act or omission of an individual state official. *Hare*, 74 F.3d at 644-45.

## II.    Episodic Acts vs. Conditions of Confinement

The parties dispute whether Plaintiffs challenge a condition of Henson's confinement or an episodic act or omission by one or more state officials. This distinction was developed by our en banc court in *Hare v. City of Corinth, Mississippi*, 74 F.3d at 644-45. *See also Nerren v. Livingston Police Dept.*, 86 F.3d 469, 473 n.25 (5th Cir. 1996) (describing *Hare* as "a single opinion that clearly and concisely articulates and unifies our court's case law in this area"). In this circuit, post-*Hare*, "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Hare*, 74 F.3d at 644-45).

A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74

F.3d at 644. These conditions, practices, rules, and restrictions can be explicit, such as "the number of bunks per cell, mail privileges, disciplinary segregation, etc." *Shepherd*, 591 F.3d at 452. Or, "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Id.* (alteration in original) (quoting *Hare*, 74 F.3d at 645). When a plaintiff is challenging a condition of confinement, this court applies the test established by the Supreme Court in *Bell v. Wolfish*, and asks whether the condition is "reasonably related to a legitimate governmental objective." *See Hare*, 74 F.3d at 646; *Bell*, 441 U.S. at 539. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless— a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539. Because "[a] State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction," the plaintiff need not demonstrate that the state actor or municipal entity acted with intent to punish. *Hare*, 74 F.3d at 644. "[A] true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." *Id.* at 644-45.

For example, in *Shepherd v. Dallas County*, a former pretrial detainee sued Dallas County after he suffered a stroke in the Dallas County Jail allegedly as a result of not receiving proper medication and medical attention. 591 F.3d at 449. In his complaint, the plaintiff alleged that: "The jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of [the plaintiff's] stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel, and

these deficiencies caused his injury." *Id.* at 453. This court affirmed the jury's verdict in favor of the plaintiff, holding that the plaintiff properly presented a successful conditions-of-confinement claim. *Id.* The court emphasized that the plaintiff's claim did "not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness." *Id.* The court stressed that the plaintiff "relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke." *Id.* The court noted, however, that because "no single individual's error actually caused [the plaintiff's] hypertensive decline into a stroke," the district court was correct in granting summary judgment to the defendant on the plaintiff's episodic-acts-or-omissions claim. *Id.* at 453 n.2.

An episodic-acts-or-omissions claim, by contrast, "faults specific jail officials for their acts or omissions." *Id.* at 452; *see also Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) ("[W]here the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an 'episodic act or omission' case . . . ."). In such a case, an actor is "interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53. The relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge," and intentionality is no longer presumed. *Hare*, 74 F.3d at 645. A jail official violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had "subjective knowledge of a substantial risk of serious harm" to the detainee and responded to that risk with deliberate indifference. *Id.* at 650. In other words, the state official must know of and

disregard an excessive risk to inmate health or safety. *Krajca*, 440 F. App'x at 343. "'[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)).

In *Scott v. Moore*, the court characterized the plaintiff's lawsuit, arising out of a jailer's sexual assault of a pretrial detainee, as an episodic-acts-or-omissions case. 114 F.3d at 53-54. The court rejected the plaintiff's argument that the assault was directly caused by constitutionally inadequate staffing, and thus implicated a condition of confinement rather than an episodic act. *Id.* at 53. The court explained that "the actual *harm* of which [the plaintiff] complains is the sexual assaults committed by [the jailer] during the one eight-hour shift-an episodic event perpetrated by an actor interposed between [the plaintiff] and the city, but allegedly caused or permitted by the aforesaid general conditions." *Id.* The court emphasized that "[the plaintiff] did not suffer from the mere existence of the alleged inadequate staffing, but only from [the jailer's] specific sexual assaults committed on but one occasion." *Id.*; *see also Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997) (applying *Hare* and *Scott* and classifying claim arising out of inmate's suicide as an episodic-acts-or-omissions claim, despite allegations regarding jail's training and staffing policies); *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999) (characterizing plaintiff's complaint as "turn[ing] on [two detention officers'] alleged failure to take better care of [the plaintiff,] and [a third officer's] failure to medically screen her" for asthma and explaining that this complaint "fits the definition of the episodic omission").

Significantly, there is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately. *See*

*Shepherd*, 591 F.3d at 452 n.1. Because the Plaintiffs' allegations against the two remaining Defendants differ, we will discuss each separately.

### III.  Dr. Bolin

Plaintiffs' allegations against Dr. Bolin are properly characterized, and have been treated by both parties below, as attacking episodic acts or omissions rather than conditions of Henson's confinement. In Plaintiffs' First Amended Complaint, they asserted that Dr. Bolin acted with "deliberate indifference to Mr. Henson's constitutional rights" through a series of omissions, such as his "failure to provide appropriate medical evaluation" and his "failure to transport Mr. Henson to an appropriate medical facility." Plaintiffs also asserted that Dr. Bolin failed to provide adequate training and supervision for the nurses, who, as a result, failed to "exercise that degree of care that a nurse of ordinary prudence would have exercised under the same or similar circumstances on the occasion in question." These allegations fault "specific jail officials for their acts or omissions," *id.* at 452, rather than "conditions, practices, rules, or restrictions," *Hare*, 74 F.3d at 644. Indeed, throughout Plaintiffs' pleadings in the district court, they consistently asserted that the deliberate indifference standard should apply to their claims against Dr. Bolin. In response to Dr. Bolin's motion for a more definite statement, Plaintiffs set forth detailed factual allegations regarding their claims against Dr. Bolin. In that response, Plaintiffs explicitly urged the court to apply the deliberate indifference standard, acknowledging that it is the appropriate standard for analyzing the constitutionality of "an episodic act or omission by a governmental employee." Plaintiffs made no mention of an alternative conditions-of-confinement theory or standard. Similarly, in response to Dr. Bolin's subsequent motion to dismiss and for summary judgment, which focused solely and extensively on the deliberate indifference standard, Plaintiffs still did not express disagreement with this legal standard but,

instead, asserted that Dr. Bolin was "deliberately indifferent" to the medical needs of Henson and other inmates.

Given the Plaintiffs' allegations before the district court, we decline their invitation now to construe their claims against Dr. Bolin as attacking conditions of Henson's confinement. To do so would effectively allow Plaintiffs to amend their complaint at the appellate stage. *See Shepherd*, 591 F.3d at 452 n.1 (describing a challenge to conditions of confinement as a "claim" that can be pled and evaluated separately from, and in addition to, an episodic-acts-or-omissions claim). Accordingly, we find that as to Dr. Bolin, Plaintiffs challenged only episodic acts and omissions by him and the nurses that he supervised, rather than conditions of Henson's confinement. Because Plaintiffs on appeal have abandoned a theory of liability against Dr. Bolin based on episodic acts or omissions, no viable claims are left against him.

Even if we were to construe Plaintiffs' allegations against Dr. Bolin as challenging a condition of Henson's confinement—despite Plaintiffs' consistent representation to the district court that the deliberate indifference standard, applicable to episodic-acts-or-omissions claims, should apply—Plaintiffs' claims against Dr. Bolin would fail. Plaintiffs generalized in their complaint that Dr. Bolin "condoned and enforced with fear and intimidation a well-known policy and custom among the nurses of the Wichita County Sheriff's Department not to send inmates with serious medical conditions to the hospital." And on appeal, Plaintiffs allege that "Dr. Bolin fostered an environment of intimidation at the Jail, such that the LVNs (and other Jail staff) were so discouraged from contacting him regarding severely ill inmates . . . that the LVNs ultimately decided on a treatment plan for inmates." As there was no explicit policy of nurse intimidation, Plaintiffs would have to show that an unstated or *de facto* policy existed. *See Shepherd*, 591 F.3d at 452 ("In some cases, a condition may reflect an unstated or *de facto* policy . . .

."). However, in order to base a constitutional claim on Dr. Bolin's implementation of an unstated rule or policy, Plaintiffs must show that Dr. Bolin's "acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." *Hare*, 74 F.3d at 645. Plaintiffs have not done so.

Plaintiffs' evidence of a *de facto* "policy" of nurse intimidation comes mostly from a previous case involving the death of Jason Brown, a pretrial detainee who died in the Wichita County jail four months before Henson. Plaintiffs presented: (1) deposition testimony of Sheriff Callahan, taken in the Brown case, stating that Dr. Bolin is "grumpy" and "[d]oesn't like to be bothered"; (2) an affidavit of Pathena Dawn Tweed, a former nurse at the Wichita County jail, who stated that she was "personally chastised by Dr. Bolin when [she] would contact him to obtain medical instruction" and that on one occasion she defied Dr. Bolin's orders by sending a diabetic inmate to the hospital and Dr. Bolin "became very irate [and] yelled at [her]"; (3) an affidavit of Dawn Marie Wilkinson, a former nurse at the Wichita County jail, who similarly stated that she "feared calling Dr. Bolin for fear of unwarranted criticism" and that on one occasion she sent a female inmate to the hospital despite Dr. Bolin's explicit instruction not to do so; and (4) a memorandum written by a Wichita County detention officer pertaining to Brown's death, which quoted Nurse Krajca as saying: "Do you know what kind of ass chewing I would get from Dr. Bolin, if I sent [Jason Brown] to the hospital in the good health that he is in." While this evidence indicates brusque and critical mannerisms, it falls short of proving conduct so pervasive and typical as to constitute an intended condition or practice of nurse intimidation that discouraged nurses from sending inmates to the hospital. In fact, the two affidavits from former nurses support the opposite view, as they both state that

they sent inmates to the hospital despite Dr. Bolin's harsh attitude. *See Brown v. Callahan*, 623 F.3d at 256 (reviewing the same affidavits and explaining "[t]hat two nurses decided to send inmates to the ER over Dr. Bolin's objections proves the opposite of intimidation"). At most, Plaintiffs' evidence shows that, on one occasion, one nurse was cognizant of Dr. Bolin's temper as she assessed an inmate, which is insufficient to prove an unconstitutional policy. *See Shepherd*, 591 F.3d at 454 ("[I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."). More problematic, Plaintiffs put forth no evidence that Dr. Bolin's alleged intimidation of nurses played any role in the present case. *See Duvall v. Dallas Cnty*, 631 F.3d 203, 207 (5th Cir. 2011) (explaining that to prevail on a challenge to an unconstitutional condition of confinement, the plaintiff must show that the condition "caused the violation of [the inmate's] constitutional rights"). Unlike in the Brown case, which included Nurse Krajca's rhetorical statement about Dr. Bolin's temper, there is no evidence in the present case that any of the nurses who encountered Henson acted, or failed to act, out of fear for Dr. Bolin. *See Callahan*, 440 F. App'x at 358 ("[N]o evidence supports that an alleged reluctance to send seriously ill inmates to the hospital contributed to Henson's death.").

Because Plaintiffs did not assert a conditions-of-confinement claim against Dr. Bolin, and because, even if they had, such claim would fail, we find that Dr. Bolin is entitled to summary judgment and the district court's order is affirmed with respect to Plaintiffs' claims against him.

## IV.   Wichita County

As to Wichita County, Plaintiffs' First Amended Complaint challenged conditions, practices, and customs—both explicit and *de facto*—as well as acts and omissions by individual officials. For instance, Plaintiffs asserted that "Wichita County did not have adequate facilities, equipment, or trained staff

to appropriately assess and treat inmates with serious illnesses," and that Wichita County "adopt[ed] a custom and practice of allowing untrained detention officers and nurses to unlawfully practice medicine." Plaintiffs also alleged that Wichita County "adopt[ed] a custom and practice of discouraging detention officers and nurses from sending critically ill inmates such as Mr. Henson to the hospital." Plaintiffs identified more than ten prison officials who had contact with Henson while he was at the jail and who, according to Plaintiffs, did not respond properly to his medical needs. While Plaintiffs did challenge the acts or omissions of some of those officials, they also challenged the jail's multi-tiered medical system, which, according to Plaintiffs, placed untrained, unqualified, and unsupervised staff in charge of providing medical care for inmates. Like the plaintiff in *Shepherd*, Plaintiffs here allege inadequate treatment "in a series of interactions with the jail's medical system." *Shepherd*, 591 F.3d at 453. Plaintiffs' allegations do not focus only on the acts or omissions of individual officials, therefore, but also challenge the jail's system of providing medical care to inmates with serious illness. *See id.* Indeed, in their filings in the district court, Plaintiffs maintained that they "pled both an episodic act and omissions case as well as a conditions case and [that they] produced evidence of both."[4]

---

[4] Before us, however, Plaintiffs disclaimed any theory of liability against Wichita County based on episodic acts or omissions of individual officials, explicitly stating during oral argument that this is not an episodic-acts-or-omissions case. Given the posture of this case, any such claim against Wichita County would fail. In order to hold a municipality liable for a due process violation caused by a state official's episodic act or omission, the detainee must first show that there was an underlying violation by the state official. *See Flores*, 124 F.3d at 739; *see also Hare*, 74 F.3d at 649 n.4. The detainee must show that the state official acted with subjective deliberate indifference, *Scott*, 114 F.3d at 54, and "[o]nly then may he hold a municipality accountable for that due process violation," *Flores*, 124 F.3d at 739. Because none of the individual Defendants was deliberately indifferent, Plaintiffs have not shown an underlying constitutional violation for which Wichita County could be held liable on an episodic-acts-or-omissions theory. *See Callahan*, 440 F. App'x at 358 ("[T]hose who the

No. 14-10126

To assess Plaintiffs' conditions-of-confinement claim against Wichita County, we apply the test established by the Supreme Court in *Bell v. Wolfish*. *See Hare*, 74 F.3d at 644. In *Bell*, the Supreme Court explained that "the Government . . . may detain [a pretrial detainee] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." 441 U.S. at 536-37. This balance accommodates the Government's "substantial interest in ensuring that persons accused of crimes are available for trials," while respecting a pretrial detainee's constitutional "right to be free from punishment." *Id.* at 534. The Court emphasized, crucially, that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Id.* at 537. Instead, as noted, the Court held that:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539. The Court explained that "the effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." *Id.* at 540. The Court reminded that in determining "whether restrictions or conditions are

---

Henson family claims contributed to the death have not been shown to have committed constitutional violations, though they may have been negligent.").

reasonably related to the Government's interest in . . . operating the institution in a manageable fashion," courts must remember that "'[s]uch considerations are peculiarly within the province and professional expertise of corrections officials.'" *Id.* at 540 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). Courts must not become "enmeshed in the minutiae of prison operations," which will only distract from the question presented: "does the practice or condition violate the Constitution?" *Id.* at 544, 562.

With the goal of the *Bell* test—to identify conditions that amount to punishment—in mind, we turn to the conditions that Plaintiffs have challenged in the present case. In order to succeed on their conditions-of-confinement claim against Wichita County, Plaintiffs need to show:

> (1) "a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [the inmate's] constitutional rights.

*Duvall*, 631 F.3d at 207 (alterations in original) (quoting *Hare*, 74 F.3d at 645); *see also Edler v. Hockley Cnty. Comm'rs Court*, 589 F. App'x 664, 668 (5th Cir. 2014). Analyzing the first prong of this test is challenging here, as Plaintiffs do not identify one rule or practice that, standing alone, is unconstitutional. Instead, Plaintiffs, on appeal, allege that a combination of eight policies and practices, both explicit and *de facto*, created an "inadequate medical care system."[5]

---

[5] Plaintiffs try to reframe certain episodic acts or omissions as jail conditions. For instance, they claim that "Dr. Bolin's breach of contract" and the "arbitrary use of medical segregation" were part of "the Jail's inadequate medical care system." However, Plaintiffs provided no evidence that these allegedly *de facto* policies were pervasive or typical, or even that some occurred more than once. *Shepherd*, 591 F.3d at 452. Accordingly, we decline to consider the episodic acts in our conditions-of-confinement analysis.

During the time of Henson's death, the County had a "Health Services" plan ("HSP") in effect, which indicated that the jail would employ six full-time nurses and one jail physician to work at the Wichita County jail facilities. The nurses were to "assist the [jail physician] and render day-to-day care to the inmates." Dr. Bolin, who contracted with the County to provide "medical services to the jail inmates and juvenile detainees, at County detention facilities," was only required to be present at the facilities three times per week for "sick call clinics." Dr. Bolin was also required to "provide medical care for inmates needing emergency treatment in the emergency room" as well as "24 hours telephone coverage." In the event of an emergency, the nurse or detention officer was to send the inmate to the hospital. Dr. Bolin was supposed to help the jail staff and nurses establish procedures for handling acute and/or emergency situations. The nurses were not present at the facilities 24-hours per day but did receive calls during their off hours.

Plaintiffs emphasize that all of the nurses who interacted with Henson were LVNs, rather than registered nurses. Plaintiffs claim that the County's use of LVNs was in violation of the scope of their license, as provided in the Texas Nurse Practice Act, which stated that "[t]he licensed vocational nurse practice is a directed scope of nursing practice under the supervision of a registered nurse, advanced practice registered nurse, physician's assistant, physician, podiatrist, or dentist." 22 Tex. Admin. Code § 217.11(2). According to Plaintiffs, despite the limited scope of the LVN license, no one supervised the LVNs while they were working at the jail. Finally, Plaintiffs allege that "the lack of standing orders regarding pneumonia, Emphysema, and Chronic Obstructive Pulmonary Disorder (COPD), when combined with Dr. Bolin's absence, the LVNs lack of supervision, and Dr. Bolin's nurse intimidation,

forced LVNs to illegally diagnose and treat Henson."[6]   Plaintiffs claim that these policies and customs in combination created a medical care system that was "woefully inadequate."

While the Plaintiffs have identified a combination of staffing policies and practices, there is nothing constitutionally deficient about the terms of the HSP and certainly nothing that resembles punishment. *Bell*, 441 U.S. at 542. Instead, this multi-tiered staffing arrangement has a reasonable relation to providing medical attention to inmates with varying levels of need. Adding the policy of hiring LVNs instead of registered nurses and requiring LVNs to call the on-call doctor, rather than providing them with standing orders to deal with serious medical problems, also does not make the medical system unconstitutional.[7]   In order to prove that in practice Wichita County's medical system was constitutionally deficient, Plaintiffs needed to show, or at the summary judgment stage at least present evidence of, "more than an isolated incident; [they] 'must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs.'"[8]   *Edler*, 589 F. App'x at 668 (quoting

---

[6] For reasons we have already discussed, Plaintiffs failed to show that a *de facto* policy of nurse intimidation existed.

[7] Plaintiffs, pointing to excerpts from Dr. Bolin's deposition testimony, claim that no one was supervising the LVNs while they were working at the jail. Specifically, Dr. Bolin stated: "I can't supervise [the nurses] when I'm not there" and "I am not [Nurse Krajca's] supervisor. The sheriff is." These statements, taken out of context, do little to aid our understanding of the relationship between Dr. Bolin and the nursing staff. Later in the deposition, Dr. Bolin stated "I am not their supervisor, I don't hire and fire . . . I will supervise those medical occurrences that I have knowledge of and participate with. That would include sick call, telephone calls and any other direct contact." Dr. Bolin also stated that his "number one policy . . . to all staff members, the jailers, the nurses," was that "[i]f somebody is having an emergency . . . don't call me first, call 911 and get them to the hospital for appropriate medical care. The next phone call you make is call me and let me know what's going on." While Dr. Bolin disclaimed responsibility for things that happened while he was not present at the jail, he also explained that he expected the nurses and jail staff to call him and that he supervised them when they did so. This testimony does not show, as Plaintiffs allege, that the LVNs acted with no supervision.

[8] On appeal, Plaintiffs describe several other inmates who have allegedly received inadequate medical care in the Wichita County jail since Henson's death. However, Plaintiffs

*Shepherd*, 591 F.3d at 454); *see also Duvall*, 631 F.3d at 208.  Indeed, unlike the plaintiff in *Shepherd*, the Plaintiffs here have not presented evidence sufficient to demonstrate that "serious injury and death were the inevitable results of the jail's" staffing practices.  *Shepherd*, 591 F.3d at 454; *see also Duvall*, 631 F.3d at 208 (finding a *de facto* policy of exposing inmates to a disease where "the Jail experienced around 200 infections per month," and this "bizarrely high incidence" of the disease was known to the County).  Plaintiffs' evidence of one other death that took place in the jail four month prior, is not sufficient to show that the jail's medical staffing was constitutionally inadequate.[9]  *Shepherd*, 591 F.3d at 454 ("[I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate.").

Our court does not downplay the tragic death of Wilbert Henson, *see Callahan*, 440 F. App'x at 354 ("On appeal, we granted Krajca qualified immunity, finding her actions indicative of negligence, gross negligence, or malpractice, but not rising to the level of deliberate indifference to Henson's rights."), however, "the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition

---

never presented evidence of these subsequent occurrences to the district court.  *See Stults v. Conoco, Inc.*, 76 F.3d 651, 657 (5th Cir. 1996) ("[O]n summary judgment . . . this court . . . will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion." (internal citation and quotation marks omitted)).

[9] Plaintiffs also presented two expert reports, that detailed Henson's experience in the jail and explained how the medical care that Henson received, or did not receive, "caused or significantly contributed to" his death.  According to these reports, the nurses who encountered Henson in the jail "provided markedly substandard nursing care which was grossly inadequate in failing to conform to acceptable and prevailing practice of nursing care."  Further, they assert that "the failure to adequately treat [Henson's] lung condition caused unnecessary pain and suffering and may have been a direct and proximal cause of his death."  By focusing on the deficient responses of the individual staff, and particularly the nurses who allegedly failed to conform to the standard of care expected of LVNs, however, these reports support Plaintiffs' abandoned episodic-acts-or-omissions claims rather than a conditions-of-confinement claim against Wichita County.

of the Constitution." *Bell*, 441 U.S. at 562.  Plaintiffs' evidence falls short of proving that the Wichita County jail's medical system and staffing policies amounted to punishment, in violation of Henson's constitutional rights.

## CONCLUSION

For the reasons above, we AFFIRM the district court's order granting summary judgment in favor of defendants.