# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 16-10227

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2017

Lyle W. Cayce
Clerk

NICHOLE SANCHEZ; CASY SIMPSON; EDWARD LAROY SIMPSON, II, Individually and as the Representative of the Estate of Diana Lynn Simpson,

Plaintiffs - Appellants

v.

YOUNG COUNTY, TEXAS; YOUNG COUNTY SHERIFF'S DEPARTMENT,

Defendants - Appellees

————————————

Appeal from the United States District Court
for the Northern District of Texas

————————————

Before JONES, BARKSDALE, and COSTA, Circuit Judges.

PER CURIAM:

Plaintiff-appellants, the family of Diana Simpson, challenge the district court's summary judgment dismissing their § 1983 lawsuit claiming that Young County violated Mrs. Simpson's constitutional rights when she died in the county jail from a probable suicide-caused drug overdose the evening after she was arrested for public intoxication. The family asserts that the County is liable for the acts and omissions of its personnel who arrested and jailed Mrs. Simpson. The family also asserts that unconstitutional conditions of pretrial confinement, arising from the County's policies and procedures, caused Mrs. Simpson's death. For the following reasons, the judgment of the district court is AFFIRMED regarding the claim that the jailers' acts and omissions

caused Mrs. Simpson's death and render the County liable; the judgment is VACATED and REMANDED for further proceedings as to whether there is a genuine issue of material fact that the County's policies created unconstitutional conditions of confinement that caused the decedent's death.

## BACKGROUND

Mrs. Simpson struggled with depression and a year before her death had attempted suicide.  In the weeks leading up to her death, she told her husband, Edward Simpson, that if she were to attempt suicide again, she would withdraw cash from the ATM, use the cash to check into a motel so that her presence would not be traceable, and then would overdose on pills.

On May 18, 2015, Mr. Simpson noticed a cash withdrawal when reviewing his bank account online.  The night before, Mrs. Simpson had worked the nightshift at Stephens Memorial Hospital, where she often slept after her shift because her home was 75 miles away.  After calling his wife and failing to get an answer, Mr. Simpson called the hospital to inquire if his wife was sleeping there and learned that she had left after her shift.  Mr. Simpson called numerous local law enforcement agencies to report his wife missing and at risk for suicide.  He placed a photo of his wife's vehicle on Facebook asking anyone who saw it to contact the authorities.

Alerted by a woman who saw the Facebook plea and recognized Mrs. Simpson's vehicle parked on a roadside in Graham, Texas, police officer Kyle Ford found Mrs. Simpson asleep in the driver's seat about 5 p.m. on May 19.  In questioning her, Ford's arrest documents state that he observed that Mrs. Simpson's speech was slurred, she responded slowly, and she had a hard time keeping her eyes open when speaking.  He asked Mrs. Simpson whether she had consumed alcohol or taken any medication.  She replied that she had a drink the night before to help her sleep but at that point denied ingesting medicine.  Mrs. Simpson also denied having diabetes or other

medical conditions. Officer Moody, who assisted Ford, corroborated her intoxicated behavior.

Ford called Young County medics to evaluate Mrs. Simpson. After an examination, medic Jared Cook found a slightly elevated blood pressure and slightly low pulse. Mrs. Simpson confirmed to him that "she normally has high blood pressure and a low pulse." Her blood sugar level was normal, and there were no symptoms of heat stroke or dehydration. A medic asked her whether she was depressed or wanted to hurt herself; Mrs. Simpson replied "no" to both questions. Cook described Mrs. Simpson as "impaired but not altered."

Seeing a pill bottle on the passenger floorboard of Mrs. Simpson's car, Ford obtained her consent to search the vehicle, and she walked unsteadily toward the ambulance to await the search. She stated, however, that her hip had arthritis. She then told Cook that she had taken two Benadryl earlier in the day to help her sleep. Mrs. Simpson dozed off while Cook attempted to conduct a horizontal gaze nystagmus test.[1] Simpson told Cook she did not want to be taken to the hospital.

Meanwhile, in her purse, Ford found a substantial number of partially empty blister packs of medication and showed them to a medic. Several open beer cans littered the back seat. Ford took photographs, collected, and inventoried the evidence. When Ford asked Mrs. Simpson again how much of the medication she had taken, Mrs. Simpson replied that she took all that was

---

[1] A horizontal gaze nystagmus test is a standardized field sobriety test often used to determine whether an individual is under the influence of alcohol. The test ascertains the extent to which a person's eye can follow a moving object slowly with minimal jerking when the subject is intoxicated. *Babers v. City of Tallassee, Ala.*, 152 F. Supp. 2d 1298, 1302 (M.D. Ala. 2001). As one becomes more impaired, one's inability to track slowly the moving object becomes more pronounced. *Id.*

missing from the packages that morning.[2]  She also confided that she had drunk alcohol the previous night "to help her sleep."  Ford then asked her if she was trying to hurt herself but she responded that she was not.  She declined his offer to go to the hospital.

Ford arrested Mrs. Simpson for public intoxication shortly after 6 p.m. and took her to the Young County Jail.

Mrs. Simpson arrived at the jail about 6:30 p.m.  Jailer Rich filled out but did not complete Mrs. Simpson's intake medical screening form.  She checked a box "negative" for any behavior or conditions indicative of suicide. In a sworn declaration, Ms. Rich testified that Mrs. Simpson was "responsive, talking coherently and providing satisfactory answers" to her questions during the intake.  Mrs. Simpson also indicated, in response to screening form questions, that she was not depressed, not thinking about killing herself, and had never attempted suicide.  Mrs. Simpson walked unassisted to a female holding cell to sleep before finishing the booking process.

During the book-in process, no County employee ran a Continuity of Care Query (CCQ), a Texas law enforcement information-sharing service that provides real-time identification of individuals who have received State-funded mental health services within the past several years.

How frequently jail staff checked on Mrs. Simpson in the holding cell is disputed.  There is nevertheless evidence that another female detainee was placed in Mrs. Simpson's cell during the evening.  And around midnight, when Officer Post arrived at the jail, Deputy Wacaster walked Officer Post to a holding cell and told him to look through the cell window.  Officer Post saw Mrs. Simpson lying on the floor, wearing nothing but a tee-shirt.

---

[2] Mrs. Simpson's autopsy report, however, did not show traces of these particular medications.

No. 16-10227

In the meantime, after learning that his wife had been arrested, Mr. Simpson called the Graham police station and requested that they take his wife to the hospital. He told the officer she was a suicide risk, but he did not say that she might have taken drugs or overdosed because he did not know that. He was informed that she had been evaluated by medical personnel and refused to go to the hospital. He called the jail once before Mrs. Simpson arrived there and was told that an ambulance was there at the scene, and he related that she had a BOLO ("be on the lookout") report for the safety of her life. In a later call to the jail, he says he "begged" them to take his wife to the hospital. Finally, in a call to the jail about 8 p.m., Mr. Simpson requested that the Texas Department of Mental Health and Mental Retardation ("MHMR") assist his wife, but was told that MHMR would not see her until she was sober. The jail employee who took this call stated that Mrs. Simpson was just drunk and needed to sleep it off.

About 2:40 a.m., Ms. Rich entered the holding cell to finish the book-in process and found Mrs. Simpson unresponsive. Paramedics took her to the hospital where she was pronounced dead. An autopsy identified the cause of death as mixed drug intoxication, and the manner of death was found to be consistent with and highly suspicious of suicide.

Mrs. Simpson's husband and children (collectively, "plaintiffs"), sued individually and as representatives of the estate of Diana Simpson, contending that Young County violated 42 U.S.C. § 1983 and the Texas Tort Claims Act. The district court granted the defendant's motion for summary judgment, dismissing all claims. Plaintiffs appeal only the dismissal of their § 1983 claim.

**STANDARD OF REVIEW**

This court reviews a district court's grant of summary judgment *de novo*. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Summary judgment is granted when "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). The "burden of production at trial ultimately rests on the nonmovant" and the movant must merely show an "absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010). The nonmoving party must then come forward with specific facts showing that there is a genuine issue for trial. *Id.* And though we draw justifiable inferences in favor of the nonmovant, the nonmovant must put forward sufficient evidence to enable us to draw this inference. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). There is "no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). This court may affirm a grant of summary judgment on any grounds supported by the record and argued in the district court. *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 378 (5th Cir. 2016).

## DISCUSSION

Plaintiffs' § 1983 case invokes alternative theories for the County's liability for the death of Mrs. Simpson: the unconstitutional "conditions of confinement" at the Young County Jail, or the "episodic acts and omissions" of jailers. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc). We accept plaintiffs' characterization of the case as concerning whether Mrs. Simpson exhibited serious medical needs, not simply whether she was suicidal upon admission to the jail.[3] The "unconstitutional conditions" theory

---

[3] The district court incorrectly maintained that plaintiffs may only bring a "pretrial detainee suicide case" under a theory of episodic acts or omissions for which individual defendants, not the county, ordinarily bear liability. *Shepherd*, 591 F.3d at 452–53. This case is not a classic pretrial detainee suicide case because Mrs. Simpson did not commit suicide while detained. But plaintiffs can bring a pretrial detainee case, whether or not it

rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the part of the County. The "episodic acts and omissions" theory, in contrast, requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs. Normally, episodic acts liability falls not on the County as employer, but on the individual employees for their particular acts. *See Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009). In this case, plaintiffs are attempting to create genuine issues of material fact concerning both unconstitutional conditions of confinement and episodic acts or omissions that allegedly flowed from the County's unconstitutional policies or lack of policies.

Because the district court focused only on the plaintiffs' claim that episodic acts and omissions of the jail personnel could be imputed to the County, it did not analyze their unconstitutional conditions of confinement claim at all. In deference to the trial court's responsibility to review the record in the first instance, we vacate and remand for its consideration whether there is any genuine issue of material fact that Mrs. Simpson was subjected to the County's unconstitutional conditions of confinement.

The plaintiffs' theory of episodic acts and omissions, on the other hand, was squarely rejected by the district court on summary judgment and is poised for appellate review.

A government entity may incur Section 1983 liability for episodic acts and omissions injurious to a pretrial detainee if plaintiffs first prove that County officials, acting with subjective deliberate indifference, violated her constitutional rights; and plaintiffs then establish that the County employees'

---

ultimately involves suicide, under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement. *Id.* at 453 n.1.

acts resulted from a municipal policy or custom adopted with objective indifference to the detainee's constitutional rights. *Hare,* 74 F.3d at 649 n.4; *Lawson v. Dallas Cty.*, 286 F.3d 257 (5th Cir. 2002) (jail medics' treatment of paraplegic inmate, leading to decubitus ulcers, was subjectively deliberately indifferent, and County was liable for multiple policies indicating objective indifference to serious medical needs).

Plaintiffs' claim fails on several fronts. First, the principal evidence of the alleged "policy or custom" arises from the treatment of Mrs. Simpson, that is, from this single case. To be unconstitutional, however, a municipal entity's policy that derives from custom or practice must be "so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Further, "[a] municipality is almost never liable for an isolated unconstitutional action on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Plaintiffs offered no evidence about the alleged maltreatment of any other detainees at Young County's jail.

Second, regardless whether there was sufficient evidence to create a genuine, material fact issue that the failure of jailers to "complete" Mrs. Simpson's intake screening questionnaire and to request a CCQ reflected County "policies or customs," these are matters of file documentation. There is no proof that any such alleged deficiencies in jail procedures were causally linked to Mrs. Simpson's death under the circumstances of this case. The intake questionnaire was substantially completed, in any event, and there is no evidence that Mrs. Simpson's name would have appeared on a CCQ inquiry.

Third, her treatment by the employees of the County did not indicate subjective deliberate indifference. Deliberate indifference is an extremely high standard to meet. *Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir. 1999). To demonstrate deliberate indifference, a plaintiff must show that public officers

were aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn; that they actually drew the inference; and that their response indicates subjective intention that the harm occur. *See Thompson v. Upshur County,* 245 F.3d 447, 458–59 (5th Cir. 2001). Here, Mrs. Simpson was questioned extensively about potential suicidal tendencies; she never admitted overdosing; the medics examined her and found normal vital signs and, essentially, no medical emergency; she underwent intake screening with only an indication of intoxication. The officers and jail personnel had information about Mrs. Simpson from several sources:  the EMTs, Mrs. Simpson herself (repeatedly denying the need to go to the hospital or desire to kill herself to two arresting officers, two EMTs, and Officer Rich); their own observations; and her husband.  Their individual actions may have amounted to negligence, even gross negligence, but that is not sufficient to create a genuine issue of material fact concerning deliberate indifference as to any one of them, much less a systemic failure attributable to the County.

Fourth, liability cannot be imposed on the County for any failures by Sheriff Walls in this case, because he was not involved in and had no knowledge of Mrs. Simpson's situation until after her death.  Supervisors cannot be held liable for constitutional violations committed within the jail if they had no personal involvement. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).  And notwithstanding his status as a County policymaker, the County could not be liable absent the Sheriff's direct participation.[4]

Contrary to plaintiffs' theory, a plaintiff cannot bootstrap government entity liability from the individual failures of employees because there is no respondeat superior liability under Section 1983. *Monell v. Dep't of Soc. Servs.*

---

[4] Of course, if the Sheriff was responsible for alleged "unconstitutional conditions of confinement," that would be a different issue, which the district court must address on remand.

No. 16-10227

*of City of N.Y.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978); *Hicks-Fields v. Harris Cty., Texas*, No. 16-20003, 2017 WL 2729081, at \*4 (5th Cir. June 26, 2017). This court's decision in *Shepherd* is distinguishable because his claim was not based on failures of individuals but implicated "the jail's system of providing medical care to inmates with chronic illness." 591 F.3d at 453 ("Shepherd's claim, by contrast, does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness").[5]

## CONCLUSION

The Constitution does not require that officers always take arrestees suspected to be under the influence of drugs or alcohol, or reported by relatives to be at risk, to a hospital against their wishes. *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Mrs. Simpson's decision to take her own life is tragic. The County, however, cannot be held responsible for fatal decisions she made that were, under all the circumstances, not obvious to government employees.

The judgment is **AFFIRMED** to the extent it rejected plaintiffs' episodic acts and omissions claim; **VACATED** and **REMANDED** for consideration in the first instance of plaintiffs' unconstitutional conditions of confinement claim.

---

[5] Plaintiffs also contend that the County may be liable for unconstitutional failure to train its employees, but they offered no evidence relevant or sufficient to create a fact issue on this theory.

10

No. 16-10227

RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part and dissenting in part:

Although I concur in remanding the claim for unconstitutional conditions of confinement (UCC), in order for the district court to rule on it in the first instance, I must respectfully dissent from affirming the summary judgment against the claim for episodic acts or omissions (EA/O). Regarding the EA/O claim, I disagree with the majority's factual analysis, the standard to be applied, and the resulting outcome.

In this instance, such disagreement among reasonable jurists over a summary judgment highlights a strong likelihood a reasonable juror could find for the non-movant plaintiffs—the standard for denying summary judgment. Given the genuine disputes of material fact, discussed *infra*, summary judgment was improperly granted for the EA/O claim; it should be remanded for trial, following the district court's decision on the UCC claim and a possible appeal from that decision.

## I.

It is more than well-established that, in reviewing a summary judgment, the standard of review is *de novo*, applying the same standard as the district court. *E.g.*, *Uptown Grill, L.L.C. v. Shwartz*, 817 F.3d 251, 255 (5th Cir. 2016). And, "[i]n reviewing a summary judgment motion, the court must 'refrain from making credibility determinations or weighing the evidence' and must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor". *Devon Enters., L.L.C. v. Arlington Indep. Sch. Dist.*, 541 F. App'x 439, 441 (5th Cir. 2013) (reversing summary judgment) (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 398 (5th Cir. 2007)); *see also Starnes v. Wallace*, 849 F.3d 627, 630 n.1 (5th Cir. 2017) (reversing summary judgment) ("Because of the summary judgment stance, this recitation takes

facts in the light most favorable to [the non-movant]."); *Cannon v. Jacobs Field Serv's. N. Am., Inc.*, 813 F.3d 586, 588 n.1 (5th Cir. 2016) (reversing summary judgment) ("Given the summary judgment posture, this section construes the evidence in the light most favorable to [the non-movant].").

In *Devon Enterprises*, our court vacated a summary judgment. 541 F. App'x at 440–41. There, the non-movant "produced some, albeit weak, evidence" in support of its claim. *Id*. at 442. Nonetheless, "[w]e do not pass on the credibility of the evidence; rather, we conclude only that a genuine [dispute] of material fact exists to survive summary judgment". *Id*. at 442–43.

Depth of discovery notwithstanding, the summary-judgment standard only requires the non-movant's producing sufficient evidence such that a reasonable juror could return a favorable verdict for the non-movant on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere "scintilla" is insufficient—but the plaintiffs in this instance do not need to prove their EA/O claim through discovery alone. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Plaintiffs in *Montano* (a UCC claim), for example, exposed testimonial inconsistencies at trial which were not present at the close of discovery. *Montano v. Orange Cty., Tex.*, 842 F.3d 865, 871 (5th Cir. 2016).

In the light of the depositions of the sheriff and the husband, and the numerous other items in this summary-judgment record, such as the arrest report, the requisite genuine disputes of material fact have been shown which must be decided by a trial. As stated above, and discussed *infra*, plaintiffs need only to present a genuine dispute of material fact on, *inter alia*, whether a county policy or custom violated Mrs. Simpson's rights. Fed. R. Civ. Pro. 56(a).

## II.

Mr. Simpson was a respiratory therapist; Mrs. Simpson, a registered nurse. On Saturday, 18 May 2013, Mr. Simpson, who worked day shifts,

returned to their home in Brown County, Texas, while, beginning on Friday, Mrs. Simpson started working the weekend night shift at a hospital in Breckenridge, the county seat for Stephens County. Stephens County is southwest of Young County. That county's seat, Graham, is where Mrs. Simpson's Jeep was identified on Sunday, by passersby who saw a Facebook alert posted by Mr. Simpson.

After working the Friday-to-Saturday night-shift, with the similar Saturday-to-Sunday night-shift awaiting her, Mrs. Simpson, on Saturday, 18 May, ingested 24 pills of seven various prescription medications, none of which were prescribed for her. She combined those pills with alcohol. The empty blister packs and beer cans were plainly visible when she was found on Sunday in her Jeep on the side of a highway.

Mrs. Simpson was taken into custody, transported to the Young County jail, and booked partially; she was found dead in a holding cell eight hours later, early Monday morning. During those eight hours, the jail provided Mrs. Simpson no medical attention as it both ignored the arresting officer's report, which noted all the substances found in her car and her admitting having consumed them, and waved away repeated, concerned calls from her husband, telling him on one occasion, "[w]e don't hurt people here".

Respectfully, I cannot agree fully with the majority's recitation of the facts. For example, the majority's discussion of Mr. Simpson's efforts to save his wife is inadequate. A more complete recitation of that important chain of events is required. Mr. Simpson's extensive efforts to locate Mrs. Simpson increased the likelihood that he was notably distraught by the time of his four calls to the jail. Those details in the record are striking.

Regarding Mr. Simpson's first call to the Graham police station, prompted by the tip that his wife was seen in Graham, the majority opinion at 5 states: "He told the officer *she was a suicide risk*, but he did not say that she

13

might have taken drugs or overdosed because he did not know that". (Emphasis added.) This statement is true for the first call; however, the opinion fails to mention that, in a later call, Mr. Simpson asked the jailer, "Will you please get her some help? . . . *she had said that she was going to take drugs*. I want to make sure that she's safe, that she's okay". (Emphasis added.)

According to Mr. Simpson's deposition, on the morning of Saturday, 18 May, after seeing online Mrs. Simpson's ATM cash withdrawal and failing to reach her by telephone, Mr. Simpson called the nurses' station at her hospital to ascertain whether she was sleeping at the hospital, but was told "she said she had to -- couldn't sleep here today, she needed to go get a motel room". Mr. Simpson observed, using an application on his mobile telephone, that Mrs. Simpson's mobile telephone was located somewhere between the hospital in which she worked in Breckenridge and Mineral Wells.

Given Mrs. Simpson's recent articulation to Mr. Simpson of a potential repeat suicide plan—involving waiting until she went to work, withdrawing cash from an ATM, going to a motel, and taking pills to induce her death—combined with Mr. Simpson's professional experience in emergency rooms, Mr. Simpson was understandably alarmed. Accordingly, he called Mineral Wells law enforcement around 9 or 9:30 am on Saturday, provided a description of Mrs. Simpson's Jeep and her suicide plan, and asked that entity to search for her. Mr. Simpson was told a patrol car would "go by the motels, or the main drag". About "an hour to hour and a half later", Mineral Wells law enforcement called Mr. Simpson to report "they did not find anything of her".

Mr. Simpson next called the "highway patrol department" near Weatherford, a town east of Mineral Wells, "and told them, and then they told" him to call Abilene, southwest of Breckenridge, in case Mrs. Simpson had driven in the other direction. Therefore, Mr. Simpson called the Abilene DPS.

He also contacted the Breckenridge DPS, which recommended he "might also contact Brown County, as well, where she was from". Mr. Simpson called Brownwood, the county seat of Brown County, where the Simpsons lived, but did not hear back by noon—no one had identified Mrs. Simpson's Jeep by then.

Officer Harper, with the Brownwood police department, came to the hospital where Mr. Simpson worked. Mr. Simpson recalls Officer Harper "took down . . . information [about Mrs. Simpson] and said that it hadn't been twenty-four hours, so he really couldn't file a missing persons [report], but to let him know if she didn't show up for work that [Saturday] night".

Between 4 pm and 7 pm, Mr. Simpson "was still calling and waiting to hear from the other people that [he] had called to see if there was anything". Mr. Simpson called Mrs. Simpson's employer at 7 pm to ask if she had come to work. She had not.

Therefore, as he had been directed by Officer Harper, Mr. Simpson called that officer but did not reach him. Mr. Simpson "called everyone to see if they had seen or heard anything". He called Breckenridge, and "they had not seen or heard anything". The Breckenridge police department advised Mr. Simpson to file a "BOLO [be on the lookout] report" so they could "attempt to make contact that she is safe; that she made a threat to take her own life", and advised him to do likewise with Brownwood and Brown County.

Brownwood's Officer Harper returned Mr. Simpson's call, and Mr. Simpson told the officer that the Breckenridge police advised him to file the BOLO report for Brownwood. Mr. Simpson recalls Officer Harper "became a little irritated" and said Mrs. Simpson was missing from Stephens, not Brown, County.

Mr. Simpson next called law enforcement for Stephens County, where Mrs. Simpson worked. Stephens County insisted Mineral Wells "should be the ones to" put out the BOLO, because Mrs. Simpson's mobile telephone was last

identified near there.  Mr. Simpson argued with the contact, and advised Mrs. Simpson "would stay in a motel, so that was mainly what I was trying to do, is to make sure that maybe if she was going to a motel . . . they would check".  He "gave them a description of [her] Jeep, the license plate number, her description", and advised she worked in Stephens County.  The Stephens County representative stated the BOLO report would be filed.  Mr. Simpson stayed at home all night waiting by the telephone in case Mrs. Simpson came home or called.

Early Sunday morning, 19 May, Mr. Simpson "called all . . . the law enforcement agencies again".  Around 8 or 9 am, Mr. Simpson called Brown County, his home county, and spoke with a deputy, who agreed to file a missing-persons report.  Immediately after speaking with the deputy, Mr. Simpson posted to Facebook photographs of Mrs. Simpson, her Jeep, and license plate, along with instructions:  "if someone who had please [sic] saw her, to contact me and the local law enforcement".  After publishing the notice online, Mr. Simpson "made calls".

At approximately 3 or 4 pm that Sunday, Mr. Simpson received a call from a Graham resident who remembered seeing a vehicle on the side of the road under a tree and sent her son-in-law to find Mrs. Simpson.  "They" had spoken to Mrs. Simpson and said she was sleeping in the Jeep.  And, the caller had notified the police.

After speaking with the Graham resident, Mr. Simpson called Wichita Falls DPS—a town just north of Graham—and was advised to call Graham law enforcement.  Mr. Simpson's extensive efforts made to locate his wife are crucial additions, increasing the validity of his subsequent statements to the Young County jail, and the likelihood that a jail-staff member receiving a call from Mr. Simpson would have been able to detect how concerned, if not distraught, he was.

The opinion also fails to provide full information from the summary-judgment record concerning Mrs. Simpson, Officer Ford's arrest report, and Sheriff Walls' (for Young County) stunning admissions when deposed. The majority opinion's at 4, painting Mrs. Simpson, age 50, as a coherent, sensible communicator on the night of her arrest, ignores her nonsensical affirmative response when asked whether she was pregnant. Presuming notice of the arrest report, *which was completed at the jail*, other answers from Mrs. Simpson were likewise inexplicable. The arrest report stated: "I . . . asked Simpson how much of the medicine she had taken. Simpson advised all of it that was missing this morning". Mrs. Simpson, however, told jailer Rich she was not on medication. Further cutting against summary judgment's being granted, Rich's declaration about Mrs. Simpson's partial booking was prepared two years after her death. Rich's declaration does not specify whether Rich or Mrs. Simpson completed Mrs. Simpson's booking-interview forms.

In further incompletion, Rich's declaration notes Rich was aware Officer Ford brought Mrs. Simpson into the jail intake area, and was told Mrs. Simpson was arrested for public intoxication, but makes no mention whether Rich was informed verbally, or through the report Officer Ford prepared at the jail, that Mrs. Simpson admitted taking all the missing pills from the blister packs in her car. Similarly, while stating Mrs. Simpson told her she had a peptic ulcer, Rich's declaration is silent as to Mrs. Simpson's stating she was pregnant.

Of great importance, Rich's declaration articulated a county policy to check on detainees, such as Mrs. Simpson, every 25 minutes, but made no affirmative statement as to whether Mrs. Simpson was checked in accordance with that policy. Rich stated Mrs. Simpson was fine when another inmate was placed in the same female holding cell, but offers no basis for that assertion, whether firsthand or otherwise. Rich "understood" Mrs. Simpson moved

around during a cell check, but provided no detail as to how anyone came to understand that information. These omissions raise questions as to what else was omitted in Rich's two-years-delayed declaration.

The majority states at 4, "How frequently jail staff checked on Mrs. Simpson in the holding cell is disputed". In this regard, the primary genuine dispute of material fact is, instead, whether she was checked-on at all. Rich's declaration states:

> 7. Jailers have timer [sic] set for 25 minutes to check on detainees. We check inmates every 25 minutes as required by the Young County rules for jailers.
> 8. Another arrestee, Stephanie Fitzgerald, was put in the female holding cell. Simpson was fine at that time.
> 9. I understood Simpson had been moving around when I performed a cell check.

This declaration merely supports that, at some unstated time, Rich somehow understood Mrs. Simpson "was fine" when someone placed another female in Mrs. Simpson's holding cell, and somehow Rich "understood" that, at another unstated time, Mrs. Simpson had moved.

The majority opinion makes no mention of key information in or about Officer Ford's arrest report, which the county provided in support of its summary-judgment motion. Again, and of great importance for there being genuine disputes of material fact, Officer Ford completed the arrest report at the jail. The report was signed by Officer Ford *and a jailer* whose signature is illegible.

Therefore, the summary-judgment record demonstrates genuine disputes of material fact that, when the jail received Mrs. Simpson, the county was on notice that she took "all of [the 24 pills] that [were] missing" from the wide variety of prescription blister packs found in her Jeep. Officer Ford reported bringing the bag of pills into the jail at that time. Obviously, this

information is crucial, relative to the jail staff's subjective knowledge of Mrs. Simpson's risk.

Officer Ford's arrest report notes Mrs. Simpson's slurred speech, as well as her struggling to drink a cup of water, being "unsteady on her feet", and possessing no prescription for the pills she admitted taking. And Officer Ford's report includes his conclusion that Mrs. Simpson was a danger to herself or others. In sharp contrast, while the separate incident report prepared by the EMT, who was also at the arrest site, notes Mrs. Simpson reported consuming "two Benadryl", but does not mention the empty beer cans or Mrs. Simpson's admitted consumption of 24 pills, the incident report does not indicate if or when the jail received it.

The majority opinion does not acknowledge Sheriff Walls' admissions in his deposition that he was responsible for the implementation of policies at the jail, and was unaware of Texas' Continuity of Care Query requirement dating back to 2010. The majority opinion further omits the sheriff's admission that the jail had "been out of compliance ever since '05 when -- during that jail inspection. We've been out of compliance on various things and I do not know what they are". When asked whether he kept such "information at [his] disposal so that [he could] see what [he] failed at and make sure it doesn't happen again", Sheriff Walls said no. When plaintiffs' counsel continued, "You just wait until they come in and find you out of compliance and then you fix it; right?" Sheriff Walls responded, "Yes, sir".

Likewise, the majority opinion fails to mention the news article documenting Young County's May 2013 notice of non-compliance following a routine annual inspection of the jail that took place the very day Mrs. Simpson had earlier been found dead. The inspection revealed jail staff were not trained for emergencies and "an approved mental disabilities/suicide prevention screening form" was not being completed immediately and/or in its

entirety. That evidence alone established genuine disputes of material fact as to a county policy or custom—or lack thereof—and causal connection to Mrs. Simpson's death.

Concerning the misconduct at the jail, the majority's characterization at 4 of persons staring at Mrs. Simpson's semi-exposed body fails to spell out its most important context: that it was lurid. An incident report from Officer Post of the Graham police department, who was on duty the night of Mrs. Simpson's detainment and came to the jail to book three arrestees, notes Deputy Wacaster of the Young County sheriff's office told him to look into a holding cell; and, upon doing so, Officer Post saw Mrs. Simpson on the floor, exposed. Sheriff Walls stated at his deposition: Deputy Wacaster "should have been" out on patrol that night, as he was a deputy and not a jailer; and he was later indicted for aggravated sexual assault or forcible rape of another woman.

On the other hand, some facts are not relevant. The EA/O standard, discussed *infra*, includes "deliberate indifference" to "subjective knowledge of a substantial risk of serious harm", not subsequent test results. *Estate of Henson v. Wichita Cty. Tex.*, 795 F.3d 456, 464 (5th Cir. 2015). Therefore, Mrs. Simpson's autopsy report, concerning, *inter alia*, the specific drugs that caused her death and discussed in the majority opinion at 4, note 2, has no bearing on the claim at hand.

### III.

I must also respectfully disagree with the majority on the nature and standard of EA/O law pertaining to the county's liability. This disagreement highlights the need for an updated articulation by our court.

As discussed further *infra*, an EA/O claim against a county first requires plaintiffs to prove an official, or officials, committed an episodic act or omission in violation of a pretrial detainee's constitutional rights. *Scott v. Moore*, 114 F.3d 51, 53–54 (5th Cir. 1997) (*en banc*). In that regard, I disagree with the

No. 16-10227

majority opinion's statement at 7 that "[n]ormally, episodic acts liability falls not on the [government-entity] as employer, but on the individual employees for their particular acts". (Emphasis added.) While it is true that EA/O plaintiffs almost always also name as defendants the official or officials who committed the act or omission (but was not done in this action), the EA/O framework is designed to hold *government entities* liable for their contributions to an episodic act or omission. *Scott*, 114 F.3d at 53–54; *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 n.4 (5th Cir. 1996) (*en banc*) ("We separate the two issues: the existence of a constitutional violation simpliciter and a [government-entity]'s liability for that violation.").

The majority states correctly at 9 that such government-entity liability does not arise through *respondeat superior*. Instead, EA/O law holds a government entity liable for its role in causing a constitutional violation—not for its role as employer. *See Hare*, 74 F.3d at 649 n.4. Contrary to what the majority opinion states at 9, plaintiffs do not attempt to "bootstrap" liability, but instead seek to hold the county responsible for its deliberate indifference to the risk of Mrs. Simpson's death. "While the specific episode may be perpetrated by one or more persons, any underlying conditions that may have caused it or made it possible are the product of the [government-entity]'s policy, action, or inaction." *Scott*, 114 F.3d at 54.

In our circuit, government-entity liability for EA/O rests on a two-step inquiry:

> In an episodic act or omission case, . . . [t]o succeed in holding a [government-entity] liable, the plaintiff must demonstrate [the entity's] employee's *subjective* indifference and additionally that the . . . employee's act "resulted from a [government-entity's] policy or custom adopted or maintained with *objective* deliberate indifference to the [plaintiff]'s constitutional rights."

21

No. 16-10227

*Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999) (emphasis added) (quoting *Hare*, 74 F.3d at 649 n.4) (*Olabisiomotosho* erroneously cites a non-existent n.14 in *Hare*); *see also Anderson v. Dallas Cty., Tex.*, 286 F. App'x 850, 861 (5th Cir. 2008).    For the action at hand, the district court acknowledged this EA/O standard for the county's potential liability, quoting *Olabisiomotosho*.  *Sanchez v. Young Cty., Tex.*, No. 7:15-00012-O, 2016 WL 3365248, at *5 (N.D. Tex. 27 Jan. 2016).

For the first of the two steps for analyzing the county's potential EA/O liability, "[a] jail official violates a pretrial detainee's constitutional right to be secure in [her] basic human needs only when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference".  *Henson*, 795 F.3d at 464 (quoting *Hare*, 74 F.3d at 650).  Therefore, for this appeal, the summary-judgment record is to be reviewed *de novo* for, *inter alia*, genuine disputes of material fact regarding whether officials overseeing Mrs. Simpson had subjective—not objective—knowledge of substantial risk of serious harm—not actual harm. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (*de novo* review for summary judgment).

And, while this first step does require claiming a constitutional violation by a government official, and even though many cases name an individual as at least one among other defendants, I have yet to find any fifth circuit precedent requiring naming an individual as a prerequisite to government-entity EA/O liability.    Notably, the *Scott* plaintiff initially sued the municipality as well as the jail official who had allegedly committed sexual assault.  114 F.3d at 52.  The jail official, however, was dismissed from the action following his declaration of bankruptcy.  *Id.*  Nonetheless, the action continued with only the city and its police chief as defendants.  *See id.*  This

No. 16-10227

demonstrates its not being necessary for the individual or individuals who committed the underlying constitutional violation to be held liable.

While a recent opinion from our court expounded on individual liability, the matter did not involve or address government-entity liability. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017). Still, we may look to *Alderson* for an updated understanding of the terms for step one for government-entity EA/O liability: the employee's subjective deliberate indifference.

Again, for that step, "the plaintiff must demonstrate [the entity's] employee's subjective [deliberate] indifference". *Olabisiomotosho*, 185 F.3d at 526.

> That is, the plaintiff must show that the official knew of and disregarded a substantial risk of serious harm. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). To reach the level of deliberate indifference, official conduct must be "wanton," which is defined to mean "reckless." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

*Alderson*, 848 F.3d at 419–20. "So, [for a pretrial detainee,] as to the discrete, episodic act, the detainee must establish only that the constitutional violation complained of was done with *subjective* deliberate indifference to that detainee's constitutional rights." *Scott*, 114 F.3d at 54 (emphasis in original).

For the second step in the standard for government-entity EA/O liability regarding a pretrial detainee, after establishing a jail official violated the detainee's constitutional rights, the entity may be held accountable if there exists "a direct causal link" between the violation and some entity custom or policy. *Anderson*, 286 F. App'x at 861 (quoting *Piotrowski v. City of Hous.*, 237

No. 16-10227

F.3d 567, 580 (5th Cir. 2001)).  Each step requires a showing of indifference.  But, as noted, the indifference standard for the government-entity employee is *subjective*, while the indifference standard for the entity is *objective*.  *Olabisiomotosho*, 185 F.3d at 526; *see also Hare*, 74 F.3d at 649 n.4.

Our court has defined both standards.  The standard for the official is presented *supra*.  As for the government entity, it "acts with objective deliberate indifference if it promulgates (or fails to promulgate) a policy or custom despite 'the "known or obvious consequences" that constitutional violations would result'".  *Anderson*, 286 F. App'x at 861 (quoting *Piotrowski*, 237 F.3d at 579).  To determine whether an entity may be held accountable for the unconstitutional episodic act or omission, plaintiff must "put[] forth facts sufficient to demonstrate that the predicate episodic act or omission resulted from a [government-entity] custom, rule, or policy adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights".  *Scott*, 114 F.3d at 54 (emphasis in original).

IV.

Respectfully, the majority erroneously analyzes the EA/O claim by employing precedent that is not EA/O specific.  Obviously, whether plaintiffs have an EA/O claim against the county sufficient to withstand summary judgment cannot be decided without engaging EA/O-specific precedent.

A.

The majority opinion at 9–10 and throughout, however, conflates EA/O and 42 U.S.C. § 1983 liability, despite a wealth of discrete case law.  *Lawson*, relied upon by the majority and presented as though authority on EA/O, is not a pretrial-detainee case, let alone an EA/O case; the phrase "episodic acts" never appears in that opinion.  *See generally Lawson v. Dallas Cty., Tex.*, 286 F.3d 257 (5th Cir. 2002).  On the other hand, *Henson* (and other opinions from our court) specifically articulate our EA/O standard—and even more

24

specifically, our EA/O standard for government-entity liability.  At 6 and 8 the majority makes passing mention of *Hare*—a pertinent *en banc* opinion from our court delineating between EA/O and UCC claims, following specific standards for evaluating each.  74 F.3d at 644–45, 649 n.4.  Why the majority does not rely on *Hare* or its EA/O-specific progeny for substantive analysis is unexplained.

Here, citation to *Lawson* is appropriate only in addressing (and correctly rejecting) the proposition for which plaintiffs cited the opinion—attempting to broaden the EA/O standard of *subjective* knowledge by the official for government-entity liability to mere *constructive* knowledge.  286 F.3d at 264 (applying a constructive notice standard for government-entity liability under a general § 1983 claim when assessing what policymakers should have known in maintaining an official policy with deliberate indifference).  While response to that erroneous assertion by plaintiffs is appropriate, it cannot eclipse the central EA/O analysis.

*Henson* highlighted multiple decisions from our court which clarified "subjective knowledge" for an EA/O claim.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference".  *Henson*, 795 F.3d at 464 (quoting *Estate of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011) (quoting *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)).  As noted *supra*, in the context of individual liability for an EA/O claim, our court stated recently that an official's "subjective deliberate indifference" means "the official knew of and disregarded a substantial risk of serious harm".  *Alderson*, 848 F.3d at 419–20.

In citing *Thompson v. Upshur County*, requiring an official's "response indicate subjective intention that the harm occur", the majority opinion at 9 pulls not only from an action that does not expressly concern EA/O, but from a

basic § 1983 liability standard expressly intended for individual liability only. 245 F.3d 447, 458–59 (5th Cir. 2001).  Again, the claim at issue here is expressly concerned with government-entity liability.  While our court's EA/O precedent first requires examination of an official's conduct in order to next consider government-entity liability, we are, as discussed *supra*, not concerned with standards for *liability* on the part of a county employee or official.  Again, the EA/O claim at issue is only against the county.

Similarly, where the majority opinion at 9 states "notwithstanding his status as a County policymaker, the County could not be liable absent the Sheriff's direct participation", it offers no case law to support such a proposition.  As discussed, while Sheriff Walls was certainly a county policymaker, there is no claim in this action that he is personally liable for the EA/O; only that his unapologetic flagrant disregard for state policies, as shown in his deposition contained in the summary-judgment record, demonstrates the requisite genuine dispute of material fact regarding a county custom of disregarding policies to properly take in, as well as monitor, detainees.

Likewise, the majority opinion at 10, note 5 states "Plaintiffs also contend that the County may be liable for unconstitutional failure to train its employees, but they offered no evidence relevant or sufficient to create a fact issue on this theory".  But, we must again delineate:  while plaintiffs do not seek exclusively to prevail in this matter on a lack of training, the sheriff's clear admission to the lack of training is most germane to there being genuine disputes of material fact that the customs for the county jail were unconstitutional.

As noted *supra*, the proposition for which *Monell* is cited by the majority opinion at 9, concerning § 1983 *respondeat superior* liability, is likewise incongruous with EA/O liability.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).  *Monell* concerned a class action about maternity leave.

*Id.* at 660–61. Again, EA/O liability is well-established within our circuit. *E.g.*, *Henson*, 795 F.3d at 464. Distinguishing *Shepherd* in an EA/O analysis, as the majority opinion does at 10, is also improper, given *Shepherd* was determined exclusively to be a UCC claim. *Shepherd v. Dallas Cty., Tex.*, 591 F.3d 445, 453 (5th Cir. 2009).

### B.

The limits of the county's challenge to plaintiffs' EA/O claim are notable, though unmentioned in the majority opinion. Despite erroneously urging constructive knowledge via *Lawson*, as discussed *supra*, plaintiffs ground their EA/O analysis in our court's appropriate standard, citing the proper standards articulated in *Henson* and *Scott*. For example, in their opening brief here, plaintiffs contend: when the summary-judgment record is viewed in the requisite light most favorable to them, "a reasonable jury could conclude that Young County knew that Simpson had ingested 24 capsules of seven different prescription drugs and that Simpson had obvious signs of physical incapacity, disorientation and severe intoxication".

In 27 pages in its response brief regarding the EA/O claim, the county makes no mention of the majority's concern at 9 that plaintiffs are attempting to "bootstrap government entity liability". (Of course, it is not our role to make that point on the county's behalf.) The county, rather, follows our court's two-step EA/O standard and contends: "county jailers did not know Mrs. Simpson was at substantial or excessive risk of serious harm"; "there is no evidence county jailers responded to an alleged substantial or excessive risk of serious harm to Mrs. Simpson with deliberate indifference"; and "there is no evidence Sheriff Walls failed to train or supervise his officers, that such an alleged failure caused Mrs. Simpson's death, or that a pattern of similar violations occurred".

No. 16-10227

C.

Turning to applying the appropriate legal standard for the county's liability *vel non* for the EA/O claim, plaintiffs' opening brief follows our court's two-step standard for such a claim and presents genuine disputes of material fact. Again, the requisite *de novo* review of the summary-judgment record demonstrates genuine disputes of material fact for the EA/O claim, precluding summary judgment.

1.

The elements of step one's subjective indifference by jail officials are provided in plaintiffs' brief. Knowledge "that an inmate face[d] a substantial risk of serious bodily harm" was asserted. *Anderson*, 286 F. App'x at 860; *see also Henson*, 795 F.3d at 464 (quoting *Hare*, 74 F.3d at 650) ("subjective knowledge of a substantial risk of serious harm").

Along that line, plaintiffs contend: "a reasonable jury could conclude that Young County knew that Simpson had ingested 24 capsules of seven different prescription drugs and that Simpson had obvious signs of physical incapacity, disorientation and severe intoxication". Plaintiffs also contend county officials "disregard[ed] that risk by failing to take reasonable measures to abate it". *Anderson*, 286 F. App'x at 860. Plaintiffs raised genuine disputes of material fact to that end: despite multiple calls from Mrs. Simpson's husband, including warning she was likely suicidal, plaintiffs highlight a dearth of evidence that any jail employee spoke to Mrs. Simpson or entered her cell. As the majority opinion at 5 notes, Mr. Simpson's deposition testimony in the summary-judgment record is that he "begged" for medical attention for his wife; surely that understandable conduct complements the other evidence in the summary-judgment record in establishing a genuine dispute of material fact concerning the jail staff's knowledge of Mrs. Simpson's dire need for medical attention.

28

Plaintiffs assert as a "triable issue of fact" whether the county should have reasonably given medical attention to Mrs. Simpson, such that the failure reflected deliberate indifference.   Plaintiffs made this same contention in district court, in their response in opposition to summary judgment:

> Defendants go so far as to argue that "when inmates needed care, inmates could submit a written request (sometimes referred to as a 'kite') to see a doctor to the officer on duty."   One is left to wonder how Mrs. Simpson could be expected to submit such a written request when she is passed out on the cell floor with her genital area exposed and Deputy Wacaster showing her off to other officers. . . . A jury should determine whether the jail staff's inaction in the face of all the information they possess regarding Mrs. Simpson's medical condition amounts to deliberate indifference to the medical risk Mrs. Simpson faced.

2.

Also presented by plaintiffs were the elements for step two:  objective deliberate indifference on the county's part by commission or omission of a policy or custom despite known or obvious resulting constitutional violations. *See id.* at 861.  Plaintiffs contend the unconstitutional neglect leading to Mrs. Simpson's death was rooted in customs maintained by the county—under the leadership of a sheriff who flatly stated in his deposition he did not endeavor to learn what jail procedures were State mandated, and did not follow-up when infractions were reported.   For their EA/O claim, plaintiffs' opening brief asserts two central unconstitutional customs of the county: neglecting intake and screening procedures; and failing to monitor detainees.

a.

Plaintiffs present genuine disputes of material fact regarding the enduring nature of the alleged customs about intake by supplying the summary-judgment record with evidence of other instances in which the county was taken to task for failure to complete intake forms.   Those

procedures are to draw jailers' attention to at-risk conditions for a potential detainee.  Plaintiffs contend that the county's custom of indifference in failing to screen detainees for mental health and suicide risks at intake is linked to the custom of inadequate medical care and attention given Mrs. Simpson during her detainment, which plaintiffs assert resulted in her death.

Plaintiffs' contentions on appeal are in line with their contentions in response to the summary-judgment motion in district court:  "The jail staff had direct knowledge that Mrs. Simpson took an excessive amount of prescription medication, yet the staff deliberately chose not to address the risk, creating a fact issue regarding Plaintiffs' § 1983 Episodic-Acts-or-Omissions claim".  Plaintiffs' contention concerning the county's unconstitutional customs for screening procedures was the same in district court, as stated in their response in opposition to summary judgment:  "the jail staffs' deliberate indifference directly resulted from, and was actually encouraged by, Young County's policy and custom of deliberate indifference towards screening pretrial detainees for suicide risk".

The summary-judgment record, especially through the deposition of Sheriff Walls, demonstrates the custom of neglecting intake and screening procedures.  Plaintiffs' opening brief here contends this neglect extended to a custom of inadequate jail staff training, as reflected in Sheriff Walls' deposition:  "[He] admitted . . . Young County took no steps to train jail staff with regard to completing the mental disabilities/suicide in-take form and never even asked the jail staff any questions to verify whether they were properly trained in this area".  Plaintiffs further note, in accordance with Sheriff Walls' deposition, that none of the jailers who failed to provide medical attention to Mrs. Simpson were disciplined, and the sheriff made no effort to investigate.

b.

As plaintiffs also contend, there are genuine disputes of material fact for whether the jail staff adequately monitored Mrs. Simpson, because the summary-judgment record demonstrates genuine disputes of material fact for whether she was *ever* monitored by that staff—which, as discussed, was a *de facto* custom. As noted, Rich stated in her declaration: "Jailers have timer [sic] set for 25 minutes to check on detainees. We check inmates every 25 minutes as required by the Young County rules for jailers". Rich's present-tense policy statement, offered two years after Mrs. Simpson's death, said nothing of whether those policies were adhered to during Mrs. Simpson's detention.

The only evidence of observations includes Rich's stating Mrs. Simpson "was fine" when another detainee was placed in the same cell; and a non-jailer's viewing Mrs. Simpson while she was in a compromised position on the floor. Concerning the latter, an undated report, signed by Officer Post and provided to the Graham chief of police, referencing the "Incident at Young County Jail", stated:

> On May 20, 2013 at approximately 0015 hours, I, Officer Post arrived at the Young County Jail with 3 subjects to book in that I had arrested. When I went to the booking area, Deputy Wacaster of the Young County Sheriff's Office told me to come here. Deputy Wacaster walked over to a window to a holding cell that had a metal door over the window. Deputy Wacaster told me to look through the window and he opened the metal door over the window. I looked in the room and eventually observed a white female, later identified to me as Diana Simpson, lying on the ground at the foot of the window in only a t-shirt with her genital area exposed. I then immediately walked away from the window. I then went back to the book-in area and to book-in my arrestees.

Given the report is without a date, it may have been written two years after the incident, as was Rich's declaration.

A reasonable juror could determine from this evidence, along with the sheriff's admitted ignorance of the jail's non-compliance, that the county's *de facto* policy did not follow the alleged official policy put forward by Rich, and instead could determine that the jail did not provide adequate monitoring for pretrial detainees.

In sum, "view[ing] the facts in the [requisite] light most favorable to the non-moving party and draw[ing] all reasonable inferences in [non-movant's] favor", plaintiffs provided more than sufficient evidence to preclude summary judgment against the EA/O claim. *See Devon Enters.*, 541 F. App'x at 441. Re-stated, analyzing plaintiffs' contentions and the summary-judgment record in the light of our court's EA/O-specific precedent for government-entity liability, there are genuine disputes of material fact that preclude summary judgment.

V.

The majority's stating at 10 that "[t]he Constitution does not require that officers always take arrestees suspected to be under the influence of drugs or alcohol, or reported by relatives to be at risk, to a hospital against their wishes" is unfaithful to the summary-judgment record. Surely, at the very least, some modicum of care is due a pretrial detainee for whom the jail is on notice—from multiple, unrelated sources—of drug overdose and presumed suicidal intent.

No authority need be cited for the rule that, in our *de novo* review of a summary judgment, we rule on issues of law, including whether there are genuine disputes of material fact; we do *not* rule on issues of fact. Therefore, the majority's stating at 10 that the county "cannot be held responsible for fatal decisions [Mrs. Simpson] made that were, under all the circumstances, not obvious to government employees" is an extremely improper misstep into impermissible fact-finding in reviewing a summary judgment. To the contrary,

the summary-judgment record shows genuine disputes of material fact regarding county liability for EA/O—such as Mr. Simpson's calls, Officer Ford's arrest report, the pills he brought to the jail, the screening on intake, and the monitoring of Mrs. Simpson.

In the light of our court's precedent specific to government-entity liability for EA/O, and the evidence in the summary-judgment record regarding whether Mrs. Simpson was improperly screened and not monitored in accordance with the county's own policies, I cannot join the majority in affirming summary judgment for this claim. In that regard, genuine disputes of material fact point toward the county's customs and its jailers' resulting misconduct toward Mrs. Simpson—a pretrial detainee who had already taken steps to commit suicide before being arrested—being not only unconstitutional, but also unconscionable. Therefore, and with all due respect for my esteemed colleagues in the majority, how can summary judgment against this EA/O claim be upheld?

Instead, in keeping with our court's well-established standards for *de novo* review of a summary judgment and for EA/O liability for a government entity, this claim must be remanded for trial. Therefore, I must respectfully dissent from the majority's upholding the summary judgment against the EA/O claim.